IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMADO REYES TRUJILLO,

      Petitioner,

  v.

RANDY GROUNDS, Warden,

      Respondent.

_____ /

No. C 11-1908 CW

ORDER DENYING
PETITION FOR WRIT
OF HABEAS CORPUS

Petitioner Amado Reyes Trujillo, a state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction and asserting four claims of constitutional error.  Respondent has filed an answer and a memorandum of points and authorities in support thereof and Petitioner, through appointed counsel, has filed a traverse.  For the reasons discussed below, the Court DENIES the petition.

BACKGROUND

I.   Procedural History

On January 22, 2003, a Santa Clara County jury found Petitioner guilty of one count of lewd and lascivious conduct upon a child under the age of fourteen and found that he had been previously convicted of the same offense.  On May 30, 2003, the trial court sentenced Petitioner to fifty years to life in prison. Represented by counsel, Petitioner filed a direct appeal to the California Court of Appeal, raising five grounds: (1) that

permitting a prosecution witness to testify with a support person violated Petitioner's right to a fair trial; (2) that the trial court violated Petitioner's constitutional rights by admitting hearsay evidence; (3) that the trial court violated Petitioner's right to due process and confrontation by admitting evidence of a defense witness's prior misdemeanor conviction; (4) that the trial court violated Petitioner's constitutional rights by admitting prior hearsay statements of a prosecuting witness; and (5) that the trial court invaded the province of the jury by directing a verdict on the prior strike allegation. On October 21, 2004, the Court of Appeal affirmed Petitioner's judgment in an unpublished decision. On February 2, 2005, the California Supreme Court denied Petitioner's petition for review of the denial of his direct appeal.

On July 26, 2010, Petitioner, proceeding pro se, filed a state habeas petition arguing entitlement to relief based upon claims (1), (2), (3) and (5), above. The California Supreme Court denied the petition on February 26, 2011.

Petitioner filed the instant habeas petition on April 20, 2011.

II. Statement of Facts

The following facts (including footnotes) are taken from the California Court of Appeal decision denying Petitioner's direct appeal.

Between April 1 and October 1, 2001,[1] defendant frequently visited the San Jose three-bedroom home where 12-year-old Angela and her sister Anays, who celebrated her ninth birthday during that six-month period,[2] lived with their mother Anna, their father, and their two-year-old brother. Anna, a homemaker at the time, became pregnant that summer and gave birth to a daughter in March 2002. Sonja G. stayed with the family and occupied a bedroom from April until she moved out several months later. Angela and Anays shared the second bedroom, and Anna, her husband, and their son shared the third. Sonja's boyfriend Juan often was at the house to visit Sonja. Defendant was Juan's friend.

Anna testified she had been married for six years and that she and her husband lived together during the six-month period, but he worked two jobs and "wasn't around the house very much." While Sonja rented from her, Anna considered her to be a "good friend" with whom she had no conflicts. Anna met defendant in April. During the six-month period, he came to the house a few times a week while Sonja lived there, sometimes with Juan, more often alone. He helped by cleaning the backyard once a week since Anna's husband was busy and the pregnancy restricted her activities; because she did not pay him and he had no car, Anna gave defendant rides "[t]wice a week."

Anna said Anays and Angela customarily came home from school by 2:45 p.m., and defendant customarily came over in the late afternoon about three or four times a week. Anna initially was unconcerned that the girls spent time with defendant in the backyard since everything seemed "normal" when she checked; she also had been unconcerned when he was alone with Anays outside since the yard was mostly visible from inside and she often checked on them. Anna thought defendant got along with both girls and spent equal time with them, but she noted that defendant "ask[ed] more about Anays" and why Anna paid "a lot of attention" to her. He bought more things for Anays, promised to help Anays build a house for the family puppy, and said Anays

---

[1] All further calendar references are to the year 2001 unless otherwise specified.

[2] Hereinafter, we refer to the period between April and November as "the six-month period."

reminded him of his daughter who had died.  Only after Anays reported having been touched did Anna learn that defendant previously had been convicted of child molestation.

Anna, her children, Sonja, Juan, and defendant often did things "as a group."  They all ate at a Chinese restaurant once a week, and they all often went to a weekend flea market.  Anna testified both girls were happy to receive defendant's gifts of candy and bicycles.  Anna first said defendant often gave Anays five dollars but gave no money to Angela.  On cross-examination, Anna said defendant only gave Anays money once and that she then asked him not to give her children money.

Anna said she and defendant were not romantically involved and her husband knew she was faithful.  She said her husband could "provide" for her, and she denied having financial problems during the time she knew defendant, taking or borrowing money from him, owing him money, or picking up money at his house.  Anna did admit that defendant often paid the restaurant bill and brought food to the house, but she denied he gave her $600 as a prepayment when she had agreed to rent him a room but then said "no" once her husband rejected the idea.  She said defendant offered her a loan when he was going to rent the room but she "didn't take it."

Anna described four incidents relevant to the charge involving Anays.

Anna said one occurred at the flea market near the end of the six months.  She said defendant, while hugging Anays, twice "squeeze[d] her tight and [would] not let her loose."  Anna said she spoke to defendant about this but acknowledged she first reported the hugging incident at trial.  After the hugging but before Anays reported the molestations, Anna was in her kitchen when she saw defendant walk over and rub his hand up and down Anays' bare upper thigh as she lay on a sofa wearing shorts.  When defendant sat on sofa near Anays' feet and continued the rubbing, Anna overheard Anays tell defendant "not to touch her legs."  Anna also got angry and "made [defendant] leave" the house.  No one else was in the room.  Anna testified Sonja and Juan were in the house and that she asked them that day if they ever had seen defendant do anything else to Anays.  After this incident, Anna saw defendant enter the girls'

4

room without permission.  While he was helping Juan, Anna had given him permission to use her front bathroom. Later, while Anna was towards the back doing laundry, she saw defendant in the girls' room.  Anna testified defendant was not "where he had told [her] he was going to be" and that she "took him out of there very mad." Anna said defendant did not shut the door of the girls' room; she was not asked nor did not say whether Anays was in her room at the time defendant entered it.  On October 1, two days before Anays reported the touching, Anays was in the backyard when defendant unexpectedly arrived and said he needed to measure the broken back fence.  He stayed until 6:30 p.m.  When he left and Anna called Anays to come in from the backyard, Anays asked if defendant had left because she did not want to come in until he was gone.  Anays seemed "mad."  She refused to eat and went to her room.  Anna noted that, before Anays reported the molestations, she had become depressed, "mad" and "aggressive," and that the last few times defendant came over, Anays hid or sat on the shed roof to avoid being in the house with him.

Anna testified defendant telephoned after he was told to leave the house, asked for forgiveness and said he "had not done it with any bad intentions."  On October 3, he and Juan came over, but defendant only stayed a half hour because Anna told Juan she "did not like what was happening."  While defendant was there, Anna heard him ask Anays to come down from the shed's roof so he could "take her to the Chinese food place" and heard Anays said "no."  After he left, Anays told Anna she did not want defendant at the house because he "had touched her private parts."  She said he touched her "breast area under her clothes" and below her waist in front.  She pointed to the areas without providing many details; Anna did not ask for more since they were crying.  Anays did say the touching occurred in the house and when he grabbed her as they played in the yard.

After speaking with Anays, Anna drove off looking for defendant "to hit him and insult him," but an officer stopped her and asked if she felt all right. When she explained her "problem," he said to go home and call the police.  That officer called the police, and other officers came to the house that day.  Anna tried to tell a female officer everything Anays had reported, but, because she was confused and emotional, Anna failed to mention the leg-rubbing incident or defendant's entry

into the girls' room.  Anna said she later mentioned the leg-rubbing incident to a sheriff's technician who served the subpoena.

Anna was impeached with following acts of prior bad conduct: (1) she gave a false name to police in 1994, (2) she took pacifiers from a market without paying in 2000, and (3) she fraudulently obtained $3,895 worth of food stamps and welfare checks from 1995 to 1997.  Anna testified she did not recall giving a false name to police, she had had money to pay for the pacifiers and did not intend to steal them, and she fraudulently obtained government assistance because the girls' father had left and she needed the money and that, because she paid full restitution "before the due date," the offense was reduced to a misdemeanor.

When Detective David Lee interviewed Anays at her school on October 16, she described an incident at the flea market when her mother, Sonja, and Juan were "buying some stuff" and she was at a table next to defendant.  Anays said defendant told her to take off her pants, touched her breast on top of her "rainbow colored T-shirt," and touched her "bottom" on the part she uses to "pee" on "top of the clothing."  Anays said neither of them said anything.  Anays next described an incident after school when defendant touched her while she was alone in her bedroom.  Anays was reading when he silently entered her room.  After asking where the hammer was, he knelt and rubbed Anays' bare thigh with his hand.  Anna then called defendant, and he called back; Anays begged him to go, but he would not leave until Anna kept calling him.  Anays described a third incident when defendant touched her in the backyard.  He unbuttoned her shirt and tried to touch her breast so she jumped over the fence.  Anays said defendant touched or tried to touch her "whenever he [came] over," that she told her mother about the touching after watching a program about a girl who got pregnant, and that her mother then "went to find a cop."

A redacted copy of the statement Anays gave to Officers Welker and Okubo on October 3 was admitted into evidence.  In it, Anays said "every time" she saw defendant, including their first meeting, he touched her or tried to do so.  She said he repeatedly touched her "over her clothes in her breast and vaginal area," that he touched her vaginal area on October 1 when he tried to get his hat back from her, and that she climbed the

fence and hid until he left.  She said defendant touched her when they were alone and sometimes at a restaurant when her mother left the table.  She tried putting a book or blanket on her lap at home, but defendant would move them to touch her.  Anays said once, when she was trying to call her father, who did not live at the house, defendant entered her room, hung up the telephone, threw her on her bed, hit her arm, and threatened, "If you tell anybody, somebody might get hurt because it's your fault."  Anays said this threat initially convinced her not to report the touching.  She described an incident when defendant entered her room and tried to keep her there by holding the door shut; she said she escaped, ran outside, hopped over the fence, and hid.  Anays said defendant once began to unbuckle his belt while touching her but stopped when Anna called her.  Anays said he once tried to touch her under her shirt and shorts but she pushed his hand away and that he kissed her cheek and below her lips once in the backyard.  Anays said she decided to report the touching after seeing a program about a young girl who was sexually assaulted and was pregnant.

Anays testified at trial as follows.

During the time she knew defendant, he often came to the house alone; he did not drive but often brought his bike.  Anays said defendant was nice to her and she liked him "[a] little" when she first met him.  Anays also liked Sonja.  Anays said defendant brought her things and gave her money, but "not that much;" she later conceded she earlier had testified he gave her money "every time" he saw her.  Anays said defendant brought Chinese food and was nice to her mother, they went to a Chinese restaurant every week, and on weekends the group went to a flea market where Anna shopped.

Later in her trial testimony, Anays said she "didn't like [defendant] . . . that much" when he gave her things and there were "at least three times" when he had touched her in a way that made her "uncomfortable." She did not recall when the incidents took place but said he touched her improperly the first time he came to the house.  She did not recall testifying at the preliminary hearing that it was the second time he was

7

at the house.[3]  Anays said defendant once kissed her
cheek when she turned as he tried to kiss her mouth.
Anays said he came into her room "a lot" when no one
else was there, that he twice touched her in her room,
and that one of those times her mother "call[ed] him
back out."  Anays did not recall if the door was open.
She said defendant once touched her on a day she stayed
home from school.  Anays said another time, in the
middle of the six-month period, he entered her room and
touched her when she was leaning against the wall and
her knees up.  He leaned over and touched the front part
of the body she uses to pee over her shorts.  His
fingers were held together as his hand moved "around" in
"circles."  This touching lasted about "a medium time,"
"like 20 seconds."  Defendant said nothing, and Anays
kept "closing [her] legs."  She felt "[u]ncomfortable"
and "wanted to yell" but did not because she "was
scared" of "older people."  She could not recall if she
said anything or had tried to move his hand, but she
knew he stopped when Anna called his name.  Anays then
hid under her bed, scared defendant would touch her
again.  He came back but could not find her and did not
touch her again that day.  On cross-examination, Anays
admitted at the preliminary hearing she had said the
touching occurred only once in the bedroom.

Anays testified she thought defendant also touched
where she pees the next day.  She was inside, and her
mother was outside.  She thought he touched her for a
shorter time and that he stopped when Sonja or Juan
called him.

Anays said she and defendant sometimes played alone
in the yard although she did not like doing so "that
much."  She testified he briefly touched her same front
part another time after school while they played in the
yard.  She thought the touching stopped when she grabbed
his hat, threw it away, and jumped over the fence.  She
did not return until Angela said he was gone.  On cross-
examination, she said she testified at the preliminary
hearing that she climbed the fence when he tried to
touch her and his hand "got about 14 inches from [her]
vagina."

---

[3] The preliminary hearing occurred more than six months after
the charged crimes and more than eight months before Anays
testified at trial.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Anays testified defendant touched her at the flea market while they watched the mariachi bands.  Angela was across from them and Anna was shopping when, under the table, defendant moved a hand on her same front part over her pants.  He stopped when Anna returned but touched her again at the flea market, perhaps a week later.  They were at a different table, this time with Sonja and Juan.  Anays said defendant moved his hand on her same front part.  She did not recall if anything was said or if she tried to move his hand on either occasion.

Anays was certain that, during the middle of the six-month period, defendant touched her at a Chinese restaurant when her mother and sister were in the bathroom.  He touched over her clothes where she pees, and his hand moved around in a circle until Anna returned.  Anays first said this occurred several times at the restaurant; she later seemed uncertain as to whether it had been more than once.

Anays initially did not report the touching because she was "scared."  She later told her mother because she got worried after seeing a program in which a young girl became pregnant.  She recalled telling her mother defendant last touched her two days before and telling a female officer everything she could remember; Anays did not recall defendant threatening her or telling Detective Lee that he had done so.  Asked if her mother told her "to tell the police that [defendant] had touched you in a way that you didn't like," Anays answered, "Yes."  Anays explained that her mother told her to "tell all the truth to the police."  Anays testified she told the truth to the officer, her mother never told her "to make up a story" or "to lie about [defendant] touching [her]," and she told the truth when she said defendant touched her in a way that made her feel uncomfortable.

Angela testified she began sharing Anays' room when Sonja moved in and that she knew defendant as a friend of Sonja's boyfriend.  Angela liked defendant at first because he was "generous" since he often gave her and Anays ten or twenty dollars at the flea market.  She denied that defendant gave her a bike and did not recall if he gave one to Anays.  Angela said defendant spent more time with Anays and gave Anays more money and CDs, but she "never thought about" whether he liked Anays "better" than her.

Angela testified defendant once touched her inappropriately on a weekend day in the middle of the six-month period when Anays was with their father and Anna was driving defendant, Sonja, Angela, and Angela's brother to pick up Sonja's mother.  Sonja was in the front passenger seat; in the back seat, Angela sat behind Sonja and next to defendant.  At their destination, Anna went inside while Sonja stayed in the car.  Angela said defendant then touched the outside of her legs in the mid-thigh area, that his hand touched bare skin as it moved from her knees to the hem of her shorts.  Neither of them said anything; she pushed his hand away three times, but he kept putting it back until she put a towel over her legs.  Angela was present when Anays told their mother that defendant had touched her and she saw the officers talking to Anays and Anna.  Angela said she did not report the leg incident that day because she was "scared" that defendant would "start to touch [her] again."

Angela said defendant often went to the girls' room to talk to Anays alone and that she once entered her bedroom and saw that defendant and Anays were talking.  Angela once saw defendant grab Anays' shoulders and hug her at the flea market but said the girls never were alone with him there.

Angela testified defendant continued to come over by bicycle after Sonja moved.  Angela was uncomfortable with defendant before he touched her legs, and she got "a feeling that he would do something wrong with [her] and [Anays]" when Anays stopped speaking to him, began running away from him, and refused to return until Angela said he had left.  Angela said Anays began to avoid defendant after he had touched Angela's legs and during the middle of the six-month period.  Angela testified that, after the police were at the house, she and Anays did not talk about "it" because, if they did, Anays would cry or get depressed.

Angela testified she did not tell Detective Lee about Anays running away from defendant.  She did not think about it since they mostly discussed her, not Anays.  Lee testified that, when he interviewed Angela on November 13, she said defendant had begun to move his fingers under her shorts, the car was parked at a store, and that Sonja was in the driver's seat.  Lee said he only spoke with Angela regarding Anays by asking if

10

Angela knew why he was there and by asking if Angela ever saw defendant touch Anays.

Anna testified defendant occasionally rode in the back seat with Angela. She was unsure but thought Angela had done so when Anna was going to the store. When the officers came to talk to about Anays, Anna did not know defendant had touched Angela's legs; Angela told her after talking to the police.

Defendant's friend Conrad Alayon described defendant as a "good person." Alayon met defendant in 1998, they shared a room in 1999, and they lived together again during 2001. Alayon testified that, for a period in 2001, Anna visited defendant twice a week without her children and called when she did not come by. Alayon once heard Anna tell defendant she "could not make ends meet." He never saw defendant give Anna money, but defendant once asked him to give Anna $200. Anna came to the apartment and told Alayon she took the money, but Alayon did not give it to her. During the two times he helped defendant with Anna's yard work, Alayon noticed that Anna's children "had a good friendship" with defendant, but defendant did not play with them since he and Alayon were working.

Public defender investigator Annabeya Ayala testified that, during an unrecorded interview she conducted with Anna in May 2002, Anna did not say she had seen defendant touch any of her children inappropriately, that she had seen him enter Anays' bedroom, or that she had made him leave. Anna told Ayala defendant sometimes came over unexpectedly but she could not allow him to come by after Sonja moved since her husband suspected she and defendant "had something going on." Ayala did not ask Anna if defendant ever entered Anays' room.

Sonja G. testified she stayed with Anna for less than three months[,] she moved because Anna was not a good friend, that Anna was "dangerous" and would "make [ ] up a lot of things." On cross-examination, Sonja admitted she and Anna still are on good terms, but said that, if you do a favor Anna asked "everything is okay, but then if you don't do her that favor, then things are not that good anymore."

Sonja met defendant in 2000; she described him as a "very good person and a very calm person." Sonja said Anna met defendant on a day he sat in the car when Juan

came to visit Sonja.  Anna asked them to introduce
defendant to her, but Juan refused to do so because Anna
had a husband.  Anna then introduced herself and asked
defendant to invite her to eat.  Sonja heard defendant
say no since they were running errands.  At Anna's
invitation, defendant came to the house once a week on
the weekends, and Anna had him clean the yard.
Defendant occasionally came by bike but usually Anna
picked him up.  Sonja often went out to eat with Anna,
the children, Juan and defendant.  Sonja said only
defendant or Juan paid for those meals and that Anna
would call defendant to ask him to bring food or to take
her to buy food.  Sonja first said Anna left the
children with her while doing errands but never left
them with defendant; Sonja later said Anna once gave
defendant permission to take the children to the store
alone.

Sonja never saw defendant enter the girls' room or
touch them inappropriately and Anna never asked if she
had seen him do so.  Sonja said the girls always were
happy to see defendant since he brought food and gave
them money; she said Anna urged defendant to give money
to all her children and then took the money from the
boy.  Sonja said defendant always gave each girl between
$5 and $25 at the flea market.  Sonja never left the
table so the girls never were alone with defendant
there.  When the group traveled by car, Sonja always sat
in back with the children while defendant sat in front
with Anna.  Sonja did not recall a drive to her mother's
house when she was in the front and defendant and Angela
were in the back.

Sonja testified she lent Anna money that was not
repaid and that she often heard Anna ask defendant for
money.  Three days after Anna met defendant, Sonja saw
him give Anna a $400 cash loan at his apartment.  Sonja
once saw him give Anna $100; other times, Sonja saw
defendant give Anna rolled up money.  Sonja said once
Anna met defendant she had money to eat out often and to
shop.  Anna told Sonja she received $200 to $500 from
defendant each week; Anna told Sonja each time she got
the money and would laugh about it.  Sonja said Anna and
her husband were separated while Sonja lived at the
house but the husband often came by in the evening.
Sonja did not know if defendant and Anna had had a
romantic relationship.  She testified that, before
moving out, she warned defendant about Anna being
vindictive, but he indicated he was not concerned.

Sonja said that, on the weekend before defendant was arrested, Anna asked him for $300 but he only agreed to give her $100. Sonja saw Anna "crush[ ]" the $100 bill and turn red. Anna then either told defendant "You are going to pay for that" or told Sonja "He's going to pay for this." Sonja testified Anna "was after the defendant's money."

Sonja admitted she pleaded guilty in June 2001 to filing a false police report and to being so intoxicated that she could not care for her own safety. The minute order for the conviction for filing a false police report was admitted into evidence.

Defendant testified he did not touch Anays or Angela inappropriately "at all." He said that, a week after he met Anna with Juan, she called asking him to take her to lunch. He took her to lunch with Sonja, Juan, Anays and Angela, and they then went to the flea market, where he had a couple of beers. When Anna drove him home, she and Sonja came to his room. Anna asked for money as she was leaving, and Sonja was present when he lent Anna $400; he did so because he was "somewhat drunk." Defendant testified that, thereafter, Anna constantly called his cell phone asking for money, he kept giving it to her, she never repaid him, and he continued to give her money hoping she would "stop bothering" him. He initially gave Anna $200, $300, or $400 because he had a good construction job but, toward the end of the six-month period, he was giving her $100 or $150.

Defendant testified that, after Sonja moved, he gave Anna $600 on August 27 because she was going to rent him a room, but she changed her mind the next day. When she did not return the money, defendant decided not to give her more. In September, defendant tried to avoid her ongoing requests for money by turning off his phone, but he still did her yard work, took out her garbage, went to the flea market with the family, and ate out with them.

Defendant said he usually saw Anna twice a week; they ate out on Fridays and went to the weekend flea market. He said he cleaned her yard on weekends but then said he did so on Wednesdays. He helped because Anna was a friend who was alone with children. He said Anna did not have a husband but that he and she were not romantically involved.

13

Defendant said Anays and Angela always were happy
to see him.  He said he never was alone with them
inside, he never went to their room, he never sat on a
sofa with Anays, he never was alone with either girl at
a restaurant or the flea market, and he never was in the
car's back seat with Angela.  He added that Anna never
made him leave after accusing him of rubbing Anays' leg.
He said Anna was a protective mother who did not allow
him to get close to her girls, that he never had
problems with girls, and that they never complained
about him.

Defendant said he touched Anays only three times,
that he once put his hand "over her head," he gave her a
kiss when he bought her a bicycle, and he once touched
her shoulder.  He said the only time he ever played with
the girls was on October 1, his last time at the house.
There to retrieve his bike, he was at a table when Anays
removed his hat and gave it back a couple of times but
then took it and tried to get him to catch her.  He said
he did not follow Anays when she climbed a fence but got
his hat back later when he was leaving; in retrieving
the hat, defendant first testified that he grabbed
Anays' arm.  On cross-examination, he said he touched
her shoulder but not her breasts or vagina.  He admitted
he told the police he could have "touched Anays' breasts
by accident" but testified he "didn't do it," and he
denied having shown officers how he had "grabbed Anays'
upper chest area above her breasts."  Asked if it was
possible he touched her vagina while retrieving his hat,
defendant testified, "Maybe because it was on the ground
and I grabbed my cap, so I don't know."  Defendant
denied telling the police he grabbed Anays to avoid her
falling when she jumped off the fence or that he touched
her vagina in doing so.  He said Anays did jump off the
fence but not in his direction.  Defendant said he had
been half asleep when interviewed at the station and did
not recall denying to police that he was at Anna's house
on October 1 or saying he had been cleaning his room
that day.[4]

Defendant testified Anna asked him for money on
October 4, and he gave her $50 the following day.

---

[4] San Jose Detective Juan Gonzalez testified he interviewed
defendant in Spanish in jail at 10:30 a.m. on October 14.
Gonzalez did not recall whether defendant was sleepy, but he said
defendant had been coherent and responsive.

Defendant last saw her on Sunday, October 7, when she asked for $300 because she was having furniture delivered and her carpet washed.  When he only gave her $100, Anna said, "I told you I needed money."  When he said he did not have any more, he could tell that Anna was mad.[5]

Defendant admitted pleading guilty to child molestation in 1994, but he said the mother falsely accused him of molestation and told her daughter to lie to get back at him.  He only admitted guilt because he had drunk driving tickets and did not realize the future consequences of his plea.  He said his public defender lied when he said defendant would get a sentence of one year rather than the three he received.  Defendant testified he realized he had to "be very careful" when around Anna's girls because children "accuse you for any little thing."  Defendant testified that Anna, Anays, and Angela all were "lying" at trial.  He admitted that, when stopped by police in 1994 and when arrested in this case, he had lied to police by giving a false name; he also admitted giving a false date of birth in 1994.

Detective Gonzalez testified on rebuttal that, during his interview with defendant, defendant first said he touched Anays only on the shoulder but then said he touched her upper chest above the breast and demonstrated how he touched her upper chest area with two hands "just in passing."  After denying he could recall an incident with his cap, defendant conceded there was such an incident but denied touching Anays' vagina while retrieving his cap.  After saying he did not recall whether he touched her vagina, defendant next swore he had not touched it.  Once the interview ended, he said he wanted to say something else.  He then volunteered that there had been an incident in which he touched Anays' vagina during a "game" in which she jumped from bars or a fence and landed on him.  Asked why he had not mentioned this incident earlier,

---

[5]  Detective Gonzalez testified defendant had told him that, when Anna asked for $600 for rent, he gave her $50 on the Sunday before he was arrested, but he denied Anna was mad at him for giving her only $50.  Gonzalez also testified that, when asked where he was on October 1, defendant first said he did not recall. He then said Anna called him that day to go out to eat, but he had declined because he had to clean his room; he said he was certain he had not gone to her house that day.

United States District Court
For the Northern District of California

defendant admitted he was afraid "they would get me for that."

People v. Trujillo, 2004 WL 2365386, at *1-9 (Cal. Ct. App. Oct. 21, 2004) (footnotes renumbered).

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id. at 412-

United States District Court
For the Northern District of California

13.  A state court decision is an "unreasonable application of" Supreme Court authority, that is, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  Id. at 409.  Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present

case, the highest court to issue a reasoned decision on Petitioner's claims is the California Court of Appeal.

DISCUSSION

Petitioner asserts four claims for relief in his federal habeas petition; however, in his traverse Petitioner concedes that habeas relief is not available on two of his claims.  First, the petition claims relief on the theory that the trial court's response to the jury question regarding Petitioner's prior conviction removed the only factual question regarding the conviction from consideration of the jury.  In his traverse, Petitioner recognizes that there is no federal constitutional right to a jury determination of a prior conviction allegation. Petitioner acknowledges that, instead of a jury finding, "a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees."  Jones v. United States, 526 U.S. 227, 249 (1999). Petitioner does not allege that the trial court's procedure violated this standard.

Second, in his petition, Petitioner claims that the trial court erred in admitting evidence regarding a defense witness's prior criminal convictions.  In his traverse, Petitioner concedes that there is no clearly established federal law on the issue. Thus, with Petitioner's acknowledgement that relief is not available under two of his asserted claims, the Court now addresses the remaining two claims in turn.

I.    First Ground for Relief: Admission of Evidence of
      Petitioner's Prior Conviction

     Petitioner argues that the trial court violated his

constitutional due process rights by instructing the jury that if

it found the other crimes evidence true by a preponderance of the

evidence, it could infer that Petitioner was guilty as charged.[6]

Respondent maintains that the jury was property instructed, and

points to the split verdict as evidence that the jury did not

simply infer guilt based upon Petitioner's prior conviction.

     The jury received two instructions on the issue of

Petitioner's prior conviction.  The court read California Jury

Instruction, Criminal (CALJIC) 2.50.01:

          If you find that the defendant committed a prior
     sexual offense, you may, but are not required to, infer
     that the defendant has a disposition to commit sexual
     offenses.  If you find that the defendant had this
     disposition, you may, but are not required to, infer
     that he was likely to commit the crimes of which he is
     accused.

          However, if you find by a preponderance of the
     evidence that the defendant committed a prior sexual
     offense, that is not sufficient by itself to prove
     beyond a reasonable doubt that he committed the charged
     crimes.  The weight and significance of the evidence, if
     any, are for you to decide.

Reporter's Transcript (RT) at 504-05.  The court also read CALJIC

2.50.1:

_____

     [6] Petitioner does not claim relief due to the trial court's
admission of the evidence of the prior crime, but only due to the
trial court's instruction regarding the inference the jury may
draw from the evidence.

19

         Within the meaning of the preceding instruction,
    the prosecution has the burden of proving by a
    preponderance of the evidence that the defendant
    committed a crime or sexual offense other than those for
    which he is on trial.

         You must not consider this evidence for any purpose
    unless you find by a preponderance of the evidence that
    the defendant committed the other crime or sexual
    offense.

         If you find another crime was committed by a
    preponderance of the evidence, you are nevertheless
    cautioned and reminded that before a defendant can be
    found guilty of any crime charged or any included crime
    in this trial, the evidence as a whole must persuade you
    beyond a reasonable doubt that the defendant is guilty
    for that crime.

RT at 505.

     Petitioner first argues that the jury was given conflicting

instructions on the burden of proof, and that the jury may have

found Petitioner guilty only by a preponderance of the evidence,

thus violating Petitioner's due process rights.  This is the exact

argument the Ninth Circuit considered and rejected in Schultz v.

Tilton.  There, Schultz was found guilty of committing lewd acts

upon three children under the age of fourteen.  Schultz v. Tilton,

659 F.3d 941, 943 (9th Cir. 2011).  In addition to the evidence of

the charged conduct, the prosecution provided evidence of prior

uncharged sexual misconduct involving two other minors.  Id.  The

jury in Schultz received a previous version of CALJIC 2.50.01,

and, after being convicted, Schultz filed a habeas petition

contending that the instruction violated his due process rights.

Id.  On appeal of the denial of his petition, the Ninth Circuit

reviewed <u>People v. Reliford</u>, 29 Cal.4th 1007 (2003), a decision from the California Supreme Court holding that a similar version of CALJIC 2.50.01 does not violate due process, and held that the state courts did not violate federal law in applying <u>Reliford</u> to affirm Schultz's conviction.  <u>Id.</u> at 944-45.  The Ninth Circuit held that the instructions taken as a whole were clear that Schultz could be convicted only if the evidence established guilt beyond a reasonable doubt.  <u>Id.</u> at 945.

Petitioner distinguishes <u>Schultz</u> on two bases.  First, Petitioner notes that the instruction from <u>Schultz</u> is slightly different from the instruction his jury received because the <u>Schultz</u> jury received the following additional instruction:

> If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

<u>Id.</u> at 943.  Petitioner notes the absence of this instruction from his trial, but does not offer any argument to explain how this absence renders his conviction constitutionally infirm.

The Court concludes that this difference in language is insufficient to warrant habeas corpus relief.  The language from <u>Schultz</u> is very similar in content to this portion of CALJIC 2.50.1, which was given to Petitioner's jury:

> If you find another crime was committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> found guilty of any crime charged or any included crime
> in this trial, the evidence as a whole must persuade you
> beyond a reasonable doubt that the defendant is guilty
> for that crime.

This language instructs the jury to consider the evidence of the

prior crime as part of the entire body of evidence before it and

also admonishes the jury that the evidence must prove guilt beyond

a reasonable doubt.  This difference in language is insufficient

to distinguish Petitioner's case from the holding in Schultz.

    Petitioner next distinguishes Schultz because Schultz does

not discuss the prosecution's explanation of the instruction,

whereas Petitioner contends that the prosecution in his case "made

a direct connection" between the preponderance burden of proof

instruction and how the jury could use it to find him guilty.  The

prosecutor stated:

> You can choose, if you believe it more likely than not.
> If you remember the standard about a preponderance, is
> it more likely than not that the defendant committed any
> of the other sexual offenses.  With Anays, did he commit
> any of the offenses with Angela or with Myra J.?  Is it
> more likely he committed the offense?  The law allows
> you to make certain inferences, and these are the
> inferences you can make if you find more likely than not
> that he did commit other sexual offenses.  This is what
> you can do.  You can pull this instruction out when you
> are deliberating.  You may infer that the defendant had
> a disposition to commit sexual offenses, and you may
> make the inference that he was likely to commit and did
> commit the crimes that he's being charged with.
>
>     Now, not only can you make those inferences, if you
> believe that those other offenses occurred, more likely
> than not you can also use that to show he had the sexual
> intent when he touched Anays.  You can use those other
> offenses to show that he had the sexual intent when he
> touched Angela, and you can also use those other sexual
> offenses as showing that absence of mistake or accident,

**United States District Court**
For the Northern District of California

> that it wasn't just an accident as the defendant wants
> you to believe, that, oh, maybe possibly by accident it
> happened, because I'm sorry you have already been
> convicted of molesting a little girl years before.

RT at 537-38.  According to Petitioner, the instruction and the

prosecution's explanation of the instruction encouraged the jury

to find Petitioner guilty based only on the inference drawn from

the other crimes evidence.

In adjudicating this claim on direct appeal, the California

Court of Appeal denied relief on this argument, reasoning as

follows:

> We are not persuaded by this argument since the
> jury found defendant not guilty of the lewd and
> lascivious act charged against one of the alleged
> victims here where the prior molestation conviction was
> not contested and the prosecutor forcefully argued
> defendant "molested a little girl before, and he did it
> again.  Except this time there wasn't just one victim;
> there were two more victims."  In the context of the two
> verdicts returned in this case, we are convinced there
> is no reasonable likelihood the jury misunderstood the
> instructions to allow a conviction based solely upon
> disposition evidence that was proved by less than beyond
> a reasonable doubt.

Trujillo, 2004 WL 2365386, at *13 (citations omitted).

The Court of Appeal did not act contrary to federal law in

its analysis.  A jury instruction that reduces the level of proof

necessary for a guilty verdict "is plainly inconsistent with the

constitutionally rooted presumption of innocence."  Cool v. United

States, 409 U.S. 100, 104 (1972).  However, a single jury

instruction should not be judged "in artificial isolation" and

must be considered in the context of the trial and instructions as a whole.  Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

The instructions explain the two burdens of proof and are not, as Petitioner argues, contradictory.  Instead, they explain that the jury may infer that Petitioner was "likely to commit the crimes of which he is accused," but then they immediately explain that this inference is insufficient to render a guilty verdict and that a finding of guilt requires proof beyond a reasonable doubt.  RT at 504-05.  The instructions were unlike those rejected by the United States Supreme Court in Francis v. Franklin, a case cited by Petitioner, because, as the Supreme Court noted, those instructions discussed conflicting burdens of proof and never made clear which burden of proof actually controlled.  Francis v. Franklin, 471 U.S. 307, 322 (1985).  In this case, as in Schultz, the instructions made clear that Petitioner could only be convicted if "the evidence as a whole 'proved [him] guilty beyond a reasonable doubt of the charged crime'".  Schultz, 659 F.3d at 945 (quoting Mendez v. Knowles, 556 F.3d 757, 770 (9th Cir. 2009)).

Additionally, there is not a "reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [beyond a reasonable doubt] standard."  Victor v. Nebraska, 511 U.S. 1, 6 (1994).  Looking at the actual verdict in this case, it is clear that the jury did not simply find Petitioner guilty of the charged crimes due to a

United States District Court
For the Northern District of California

finding that he had been previously convicted.  The jury found that Petitioner had been previously convicted of committing a lewd or lascivious act upon a child under the age of fourteen.  Clerk's Transcript (CT) at 247.  Had the jury simply found Petitioner guilty of the charged offenses as a result of this finding, the jury would have found Petitioner guilty of both charges.  However, the jury only found Petitioner guilty of the charge that he committed a lewd or lascivious act upon Anays, and not of the charge that he did so upon Angela.  The Court of Appeal did not violate clearly established federal law in upholding the verdict on this reasoning.  Accordingly, Petitioner's request for habeas relief on this ground is DENIED.

II.   Second Ground for Relief: California Penal Code Section 868.5

Petitioner next argues that California Penal Code section 868.5 is unconstitutional because it permits trial courts to allow a complaining witness to testify with a support person without first holding a hearing to find a need for a support person.  Respondent argues that Petitioner procedurally defaulted on this claim because he did not object at trial and that, in any event, the claim is not meritorious because the trial court did not violate any clearly established federal constitutional law.

California Penal Code section 868.5 subdivision (a) permits a prosecuting witness to have up to two support persons in attendance, one of whom may accompany the witness to the witness stand.  Subsection (b) of the code section specifies that if the

support persons are also participating in the trial as witnesses,
then the court must hold a hearing and the prosecution must show
that the persons' attendance is desired by and will be helpful to
the witness.  In reviewing Petitioner's claim for relief on direct
appeal, the California Court of Appeal provided the following
facts:

> In the present case, the trial court held no
> hearing and made no determination before allowing a
> support person to accompany Anays and Angela to the
> witness stand.  When the prosecutor said she anticipated
> there would be a non-witness support person for Anays
> and Angela, the trial court asked for comment.  Defense
> counsel replied, "Submitted."  The court then said it
> would follow "statutory authority and allow a support
> person or persons."  Defense counsel did not object at
> that point nor had he objected to the prosecutor's
> earlier written request that the court "take special
> precautions to provide for the . . . support" of Anays.
> Before the first witness testified, the trial court
> instructed the jury with a version of CALJIC No. 2.20
> that lists as a factor a jury may consider in assessing
> credibility "the witness' conduct, attitude, manner
> while testifying."  When the prosecutor called Angela to
> the witness stand later that day and said Angela "will
> have a victim advocate up on the stand," the defense did
> not object.  Similarly, the defense did not object when
> the court instructed the jury that "the lady that's with
> Angela,[7] under California law under certain
> circumstances[,] minors are allowed to have a support
> person, and that is all this woman is doing.  She's been
> instructed not to communicate with the witness in any
> way, other than just being with her during the
> testimony."  Later, when Anays took the witness stand,
> the prosecutor said Anays would have "a support person
> from the Victim Assistance Center."  This time, the
> support person introduced herself as Elvia Enrique, the
> same person listed in the Clerk's Transcript as the
> support person for Angela.  The court did not reinstruct
> the jury regarding her role but asked if Enrique knew

---

[7] The clerk's transcript identifies the support person for
Angela as Elvia Enrique.

> what her "job as a support person . . . involves."
> Enrique replied, "Yes."  The defense did not object
> during this colloquy.  At the end of the trial, the
> court instructed the jury that one of the listed factors
> it could consider in determining credibility was "[t]he
> demeanor and the manner of the witness while
> testifying."  Pursuant to CALJIC No. 2.20.1, the court
> also told the jury how to evaluate the testimony of a
> minor who is age ten or younger.  The defense neither
> objected to these instructions nor proposed one about
> the support person.

Trujillo, 2004 WL 2365386, at *10-11.  The Court of Appeal

reasoned that even assuming Petitioner was entitled to a hearing

and determination of the necessity of a non-witness support

person, he had waived those rights by not objecting.  Id. at 11.

The court also held that even if Petitioner had not waived his

claim, any error was harmless beyond a reasonable doubt.  Id.

Both Anays and Angela testified with a support person and the jury

convicted Petitioner of only one charge; thus the court reasoned

that the presence of the support person did not influence the

jury's assessment of the witnesses' credibility.  Id.

As noted earlier, Respondent argues that this claim is

procedurally defaulted as barred under California's

contemporaneous objection rule.  The procedural default analysis

proceeds in two steps.  First, the federal court must consider

whether the procedural rule the state court invoked to bar the

claim is both "independent" and "adequate" to preclude federal

review.  Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir. 2003).

Once the state has adequately plead the existence of an

independent and adequate state procedural ground as a defense, the

burden to place that defense at issue shifts to the petitioner, who "may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." Id. at 586.  The burden then shifts back to the state.  "'The scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner.'"  Id. at 584-85 (citation omitted).

Second, if the procedural rule invoked by the state court is both adequate and independent, then the next step of the evaluation requires the federal court to consider whether the petitioner has established either "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  If a petitioner cannot meet this burden, then federal habeas review is barred.  Noltie v. Peterson, 9 F.3d 802, 804-05 (9th Cir. 1993).

Respondent has adequately plead that Petitioner's claim is procedurally defaulted because the state courts denied Petitioner relief under the state's contemporaneous objection rule.  Thus, the burden shifts to Petitioner to demonstrate that the contemporaneous objection rule is not adequate or independent.  As Petitioner acknowledges, there is recent, binding Ninth Circuit

United States District Court
For the Northern District of California

authority affirming a longstanding holding that California's contemporaneous objection rule is an independent and adequate state procedural rule.  See e.g. Fairbank v. Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011) (citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981) and Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002)).  In his traverse, Petitioner argues that the Ninth Circuit's decision is wrong; however, Petitioner provides no basis upon which this Court may deviate from binding authority. District courts within the Ninth Circuit must follow published Ninth Circuit decisions.  Gonzalez v. Arizona, 677 F.3d 383, 390 n.4 (9th Cir. 2012)(en banc).  Accordingly, this Court can only conclude that review of Petitioner's claim is procedurally defaulted.

Because the claim is procedurally defaulted, Petitioner is only entitled to review if he can establish either "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  Petitioner argues neither cause and actual prejudice nor a fundamental miscarriage of justice.  Accordingly, this Court cannot review his claim.

Even if the Court reviewed Petitioner's claim, it could not grant relief because the claim is without merit.  First, both parties acknowledge that there is no United States Supreme Court authority addressing the constitutionality of a support person for

a victim witness and there is no authority clearly establishing any right to a threshold hearing or finding of necessity.  Because this Court may only grant habeas relief where the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), this lack of authority is sufficient for the Court to deny Petitioner's claim on the merits.

Petitioner argues that relief is available under Williams v. Taylor, in which the Supreme Court articulated that a state court's decision is an "unreasonable application" of established federal law when the state court "unreasonably refuses to extend [a legal] principle to a new context where it should apply." Williams v. Taylor, 529 U.S. 362, 407 (2000).  Petitioner argues that the trial court's failure to hold a hearing to determine the necessity of the support person ran afoul of general principles of the Confrontation Clause and Petitioner's right to a fair trial and the presumption of innocence.

In Maryland v. Craig the United States Supreme Court explained, "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990).  The Court specified four elements that serve the purpose of the Confrontation Clause:

United States District Court
For the Northern District of California

"physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." Id. at 846.  Petitioner acknowledges that Anays and Angela were physically present when they testified and that they were subjected to cross-examination. Petitioner argues that the process ran afoul of the Confrontation Clause because the presence of the support person "necessarily impacted the jury's assessment of the demeanor and credibility of this witness."  Traverse at 29.  However, as Respondent argues and the state Court of Appeal explained in its opinion, the record does not support Petitioner's contention that the support person affected the jury's assessment because the same support person was present for both Angela's and Anays's testimony, and the jury found only Anays's testimony to be credible.  Accordingly, even if the Court were to review Petitioner's Confrontation Clause claim on the merits, Petitioner would not be entitled to relief.

As noted, Petitioner also argues that the trial court's failure to hold a hearing to determine the necessity of the support person violated his due process right to a fair trial and the presumption of innocence.  In support of his argument, Petitioner cites Estelle v. Williams for the idea that "courts must be alert to factors that undermine the fairness of the fact finding process."  Estelle v. Williams, 452 U.S. 501, 505 (1976). The trial court did not violate clearly established federal law when it did not extend this broad language from Estelle to apply to the witness support person in this case.  Petitioner argues

United States District Court
For the Northern District of California

that the presence of the support person "could only have added to Anays's credibility."  Traverse at 32.  But again, the jury's findings in this case belie that contention because the jury returned a mixed verdict and the same procedure was followed for the testimony of both Anays and Angela.  Thus, even if the Court were to review his due process arguments on the merits, Petitioner would not be entitled to relief.

Accordingly, for the reasons explained above, Petitioner's request for habeas relief is DENIED.

III. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling.  Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists would not find its ruling on any of Petitioner's claims debatable or wrong. Therefore, a certificate of appealability is DENIED.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The petition for a writ of habeas corpus is denied.

2. The Clerk of the Court shall enter a separate judgment and close the file.  Each party shall bear his own costs.

3. A certificate of appealability is denied.

IT IS SO ORDERED.

Dated: August 5, 2015

_____
CLAUDIA WILKEN
United States District Judge